**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ANN MARGARET MILLS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 4:16-CV-0331-Y-BL** |
| | § | |
| **NANCY A. BERRYHILL,[1]** | § | |
| **Acting Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Commissioner of Social Security ("Commissioner")[2] denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[3] *See* Compl. (doc. 1). The Commissioner has filed an answer, *see* Answer (doc. 10), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "R."] (doc. 12), including the hearing before the Administrative Law Judge ("ALJ"). The parties have briefed the issues. *See* Pl.'s Appeal (doc. 14); Def.'s Resp. Br. (doc. 15); Pl.'s Reply (doc. 16). The United States District Judge referred the case to the undersigned pursuant to 28 U.S.C. § 636. After considering the pleadings, briefs, and administrative record, the undersigned recommends that the Commissioner's decision be reversed and remanded for further consideration.

---

[1]On January 20, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), the Court automatically substitutes her as the named defendant.

[2]The Commissioner was formerly known as the Secretary of Health and Human Services. Older cases, therefore, refer to the Secretary.

[3]Title II governs disability insurance benefits. *See* 42 U.S.C. §§ 401-34. This recommendation will often refer to Plaintiff as Claimant, a designation used in social security cases.

# I. BACKGROUND

Plaintiff initially claimed disability due to irritable bowel syndrome ("IBS"), depression, migraines, and ulcer. R. 266. She protectively filed an application for DIB on November 29, 2012. R. 263. She also filed an application for DIB in July 2013, alleging disability beginning October 31, 2012. R. 152. Her date of last insured ("DLI") passed on December 31, 2016, *see* R. 263, or will expire December 31, 2017, *see* R. 74, 84.[4] Therefore, the most relevant time period for her application and the Court's review commenced in October 2012 and either continued through December 2016 or continues through December 2017.

The Commissioner denied the applications initially and on reconsideration. *See* R. 74-95. On September 8, 2014, Administrative Law Judge ("ALJ") Darren Hamner held a hearing on Plaintiff's claim. *See* R. 33-73. On February 20, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing work that existed in significant numbers in the national economy. R. 11-26. Applying the sequential, five-step analysis set out in the regulations (20 C.F.R. § 404.1520(a)(4))[5] the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. R. 13.

The ALJ next determined whether Plaintiff had any severe impairments and listed the following impairments as severe: "migraine and chronic headaches, irritable bowel syndrome, post traumatic stress disorder, and personality disorder." *Id.* In an earlier "Applicable Law" section of his decision, the ALJ stated:

---

[4]The circumstances of this case do not require the Court to determine which DLI is accurate.

[5]In March 2017, the Social Security Administration amended many regulations. However, the pertinent version for this case is the one in effect when the ALJ issued his decision. *See Young v. Berryhill*, No. 16-20786, 2017 WL 2312859, at *2 n.3 (5th Cir. May 26, 2017) (per curiam). Except to bring attention to the effective date of an amended provision, this recommendation will cite to the applicable version without parenthetical year information.

An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. (20 CFR 404.1521; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p).

R. 12. Immediately following his list of severe impairments and when making his Step 2 finding, the ALJ also recognized that "[t]he medical evidence establishes that the claimant's impairments of migraine headaches, headaches, irritable bowel syndrome, obesity, and affective disorder cause more than a slight abnormality, that has more than a minimal effect on the claimant's ability to perform basic work activities (20 CFR 416.920(c), 416.921, SSR 85-28)."[6] R. 13. Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[7] R. 14-16.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[8] to perform a limited range of light work as defined in 20 C.F.R. § 404.1567(b).[9] R. 17. In addition to

---

[6]The reference to regulations applicable in Title XVI cases is immaterial, because the relevant Title II regulations are materially the same. Furthermore, the ALJ does not explain why he lists obesity and affective disorder at that point, but did not specifically list them in his third finding.

[7]Section 404.1525 explains the purpose and use of the listings of impairments.

[8]Section 404.1545(a)(1) explains that a claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. 20 C.F.R. § 404.1546(c). However, that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* § 404.1545(a)(3).

[9]The regulations address physical exertion requirements and explain:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sed-

the usual light-work requirement of lifting/carrying ten pounds frequently and twenty pounds occasionally, the ALJ also specifically found that Plaintiff would need to "alternate sitting and standing at will" and would be limited to occasional stooping, kneeling, crouching, and crawling, but precluded from climbing ladders, ropes, or scaffolding. *Id.* Plaintiff also had the following environmental restrictions: (1) "no work at unprotected heights or around dangerous moving machinery" and (2) limited to indoor, temperature-controlled environments. *Id.* Given her impairments, she "may not be required to use a computer for more than occasionally" and could not perform complex tasks, but could perform detailed tasks. *Id.*

Based upon the RFC determination and testimony from a vocational expert ("VE") about the exertional demands and skill requirements of Plaintiff's prior jobs, the ALJ concluded that Plaintiff could not perform her past relevant work, but could perform jobs that exist in significant numbers in the national economy. R. 24-25. The VE identified three light, unskilled jobs that would be available for a hypothetical person with an RFC consistent with that assessed for Plaintiff. *See* R. 25. At Step 5 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act between October 31, 2012, and the date of the ALJ's decision. R. 25-26.

The Appeals Council denied review on March 10, 2016, because it "found no reason" to review the ALJ's decision. R. 1-3. The ALJ's decision is the Commissioner's final decision and

---

entary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). In general, light work "requires being on one's feet" for six hours of an eight-hour workday while "[s]itting may occur intermittently during the remaining time." Titles II and XVI: Determining Capability to Do Other Work – the Medical-Vocational Rules of Appendix 2, SSR 83-10 (PPS-101), 1983 WL 31251, at *5-6 (S.S.A. 1983).

is properly before the Court for review.  *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on May 9, 2016.  *See* Compl.  She  presents three issues for review within the context of a lack of substantial evidence to support the Commissioner's decision to deny benefits.  *See* Pl.'s Appeal at 1-2.

## II.  LEGAL STANDARD

In general,[10] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit."  *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)).  To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007).  If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated."  *Id.* at 448.  The Commissioner

---

[10]The Act provides an alternate definition of disability for blind individuals who are fifty-five years of age or older.  *See* 42 U.S.C. § 423(d)(1)(B).  This provision is inapplicable on the current facts.

must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

## III. ANALYSIS

This appeal raises the following issues: (1) whether the ALJ erred in his definition of severe impairment in contravention of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and whether he

properly considered all of Claimant's severe impairments; (2) whether the ALJ properly considered medical opinions when determining her RFC; and (3) whether the ALJ properly determined that her medical impairments had not increased in frequency or severity and would improve with treatment. *See* Pl.'s Appeal at 1-2.

## A. Step 2 Severity Standard and *Stone*

Relying on *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and interpreting cases (*Sanders v. Astrue*, No. 3:07-CV-1827-G-BH, 2008 WL 4211146 (N.D. Tex. Sept. 12, 2008) (adopting recommendation of Mag. J.) and *Charlton v. Astrue*, No. 3:10-CV-0056-O-BH, 2010 WL 3385002 (N.D. Tex. July 14, 2010) (recommendation of Mag. J.) *accepted by* 2010 WL 3385000 (N.D. Tex. Aug. 26, 2010)), Claimant asserts that the ALJ applied the wrong legal standard at Step 2. Pl.'s Appeal at 1-4. She contends that such error mandates remand for further consideration and application of the proper standard is more than use of magic words. *Id.* at 4. The Commissioner acknowledges that the ALJ did not cite to *Stone* or a similar case. Def.'s Resp. Br. at 3. Nevertheless, she argues that remand is unwarranted because the ALJ applied the correct standard as shown by his cite to SSR 85-28 and, even if the ALJ erred, such error was merely harmless. *Id.* at 3-5.

There is significant judicial disagreement regarding legal issues related to the asserted *Stone* error. The district courts disagree as to whether the language used by the ALJ fails to comply with *Stone*. *Compare Acosta v. Astrue*, 865 F. Supp. 2d 767, 779-80 (W.D. Tex. 2012) (thoroughly discussing issue and listing cases on both sides) *with Padalecki v. Astrue*, 688 F. Supp. 2d 576, 580-81 (W.D. Tex. 2010); *Charlton*, 2010 WL 3385002, at *6-7; *Luna v. Astrue*, No. 3:09-CV-1436-M-BH, 2010 WL 582151, at *6 (N.D. Tex. Feb. 18, 2010) (accepting recommendation of Mag. J. without objection); *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805-06 (N.D. Tex. 2009) (accepting recom-

mendation of Mag. J. without objection); *Sanders*, 2008 WL 4211146, at *7. Even when courts find a *Stone* error, they disagree as to whether such error may be deemed harmless. *Compare [Darrell] Jones v. Astrue*, 851 F. Supp. 2d 1010, 1015-18 (N.D. Tex. 2012) (harmless error applies); *[Ramona] Jones v. Astrue*, 821 F. Supp. 2d 842, 850-51 (N.D. Tex. 2011) (same) *with Padalecki*, 688 F. Supp. 2d at 581 (finding *Stone* error mandates remand even when the ALJ proceeded past Step 2); *Scroggins*, 598 F. Supp. 2d at 806-07 (finding *Stone* error mandates remand). These judicial disagreements warrant a thorough analysis of the alleged *Stone* error.

At Step 2 of the sequential evaluative sequence, the ALJ will find the claimant not disabled, unless the ALJ finds that the claimant has a severe impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). This definition is consistent with how the Social Security Administration defines non-severe impairments:

> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—
>
> > (1) Physical functions such as walking, standing, sitting, lifting, push-ing, pulling, reaching, carrying, or handling;
> >
> > (2) Capacities for seeing, hearing, and speaking;
> >
> > (3) Understanding, carrying out, and remembering simple instruc-tions;
> >
> > (4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.* § 404.1521 (effective through Mar. 26, 2017).[11]

In *Stone*, the Fifth Circuit discussed the historical basis for the severity requirement; the Commissioner's interpretation of that requirement; § 404.1520(c) as it then existed;[12] and the relevant statute, 42 U.S.C. § 423(d). *See* 752 F.2d at 1100-06. At the time of the *Stone* decision, the Fifth Circuit "had a number of cases . . . in which the administrative determination was made against disability at step two on grounds of nonseverity." *Id.* at 1101. It reiterated a prior holding that the regulatory definition "must be read in light of the earlier regulations defining severe impairment adopted in 1968" because "the new terminology was intended solely to clarify, not to change, the definition of 'severe impairment.'" *Id.* (quoting *Estran v. Heckler*, 745 F.2d 340, 340 (5th Cir. 1984) (per curiam)). The 1968 regulations described a non-severe impairment as "a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or combination of abnormalities." *Estran*, 745 F.2d at 341 (quoting 20 C.F.R. § 404.1502(a) (1968)).

In light of the 1968 description of a non-severe impairment, *Stone* restated a prior determination of the standard for determining whether an impairment is severe: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." 752 F.2d at 1101 (quoting *Estran*, 745 F.2d at 341 (quoting *Brady*

---

[11]Effective March 27, 2017, § 404.1521 was renumbered to § 404.1522 without textual change.

[12]Despite the passage of time and amendments to the regulation, the severity definition has not changed other than to add the phrase "or combination of impairments." *Compare Stone*, 752 F.2d at 1100 n.3 (quoting 1984 version of regulation) *with* 20 C.F.R. § 404.1520(c) (current version effective Aug. 24, 2012).

*v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) and citing *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir. 1984); *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984) (per curiam)). Over the years this standard has become known as the *Stone* standard in the Fifth Circuit even though it arose from prior Fifth Circuit decisions that relied on persuasive authority from other jurisdictions. For ease of reference, this recommendation will refer to this standard as the "slight abnormality" standard. *See Acosta*, 865 F. Supp. 2d at 774 (using that apt description).

Reviewing the primary precedent that formed the *Stone* analysis – *Chico v. Schweiker*, 710 F.2d 947 (2d Cir. 1983) (decided June 27, 1983); the Eleventh Circuit *Brady* decision (decided February 9, 1984); *Estran* (decided November 1, 1984); *Davis* (decided December 10, 1984); and *Martin* (decided December 17, 1984) – provides insights into the *Stone* decision. As already mentioned, the per curiam *Estran* decision found the 1968 regulatory definition relevant to the proper severity standard. 745 F.2d at 340-41. It also found *Chico* and *Brady* persuasive and supportive of its interpretation of the regulations. *Id.* at 341. As noted in *Estran*, *Chico* had recognized that the meaning of the regulations were actually "far less restrictive" than the literal language used because the new language merely clarified the 1968 regulations. *Id.* (citing *Chico*, 710 F.2d at 954-55 n.10). *Estran* found *Brady* notable because it followed *Chico* and formulated the severity standard. *See id.* Because the ALJ may have applied an improper severity standard, the Fifth Circuit remanded the case to the district court "with instructions to remand the case to the Secretary for reconsideration of the facts in the light of the proper standard after considering such further evidence as may be offered." *Id.* at 342.

Following *Estran*, the Fifth Circuit again relied on *Chico* and *Brady* when it decided *Davis* a month later. *See* 748 F.2d at 296-97. The court restated that if the ALJ did not consider "the 1968

standard then his decision constitutes the application of the wrong standard in determining whether Davis' impairments were severe." *Id.* at 296. The court then concluded that the ALJ had applied the wrong standard, questioned why the ALJ continued the sequential analysis after finding that the claimant had no severe impairment, vacated the district court's affirmance, and remanded the case to the district court "with instructions to remand the case to the Secretary for explicit consideration of the facts in the light of the proper standard after considering such further evidence as may be offered by either Davis or the Secretary." *Id.* at 297.

A week after *Davis*, the Fifth Circuit again took issue with an ALJ decision finding that the claimant had no severe impairment. *See Martin*, 748 F.2d at 1029-34. Recognizing that "the *Estran-Brady-Chico* formulation of the step 2 non-severity elimination test is correct and accords with the Secretary's understanding of her own regulations"; (2) such formulation also "accords with the text of 42 U.S.C. § 423(d)"; and (3) it "is consistent with the apparent meaning of 'significantly limit . . . basic work activities' as stated in 20 C.F.R. § 404.1520(c) (1984)," the court found that the Secretary erred in finding the claimant's impairment non-severe. *Id.* at 1032-33. The Fifth Circuit also found that the district court had erred in deciding the case at Step 5 for two reasons: (1) it is not appropriate on judicial review for a court to "apply administrative criteria not themselves considered by the Secretary" and (2) the district court applied the Step 5 standard erroneously as a matter of law. *Id.* at 1031. Given the clear nature of the claimant's impairment and satisfaction of Step 3 criteria for such impairment, the court remanded the case to the district court for an award of benefits. *Id.* at 1037.

The Fifth Circuit decided *Stone* just two months after *Davis*. *See* 752 F.2d at 1099. At that point, administrative findings were "not being made under the standard of non-severity stated in

*Estran*, *Davis*, and *Martin*" and the agency expressed disagreement with the Fifth Circuit's "construction of its regulations." *Id.* at 1103. Obviously dissatisfied with the agency's position, the court emphatically stated:

> If the Secretary, the administrative law judges, and appeals council regard the severity of impairment requirement as a matter for administrative definition and decision apart from the ability or inability of a particular claimant to engage in substantial gainful activity, their disability decisions will not comport with the law as we recognize it. If they allow the factfinding to rest alone upon a marshaling of medical proof under an administrative standard of medical severity that disregards the ability of any or all claimants to work, the administrative findings will not be acceptable to us; and it will be inappropriate for courts to review these administrative decisions by affirming upon substantial evidence of the claimants' inability to do past work, or engage in work available in the national economy.

*Id.* (citing *Martin*, 748 F.2d at 1034). It held that the "Secretary does not have the authority to construe the severity regulation so as to deny benefits to individuals who are disabled within the meaning of section 423(d)." *Id.* at 1105. It reaffirmed that "*Estran*, *Davis*, and *Martin* has stated the proper construction of the term 'severe impairment' found in the severity regulation," and found that "the Secretary's construction would render the regulation invalid." *Id.*

Given the agency's position and the then prevailing experience "with cases where the disposition has been on the basis of nonseverity," the court stated its often-quoted burden placed upon the agency that it

> will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used. Unless the correct standard is used, the claim must be remanded to the Secretary for reconsideration.

*Id.* at 1106. Because the court "conclude[d] that the wrong standard was applied," it remanded the case to the district court "with instructions to remand the case to the Secretary for reconsideration

of the facts in the light of the proper standard, after considering any further evidence as may be offered by either the claimant or the Secretary." *Id.*

In response to *Estran* and *Stone*, the agency issued a statement to clarify its policy for determining when an impairment may be found not severe. *See* Titles II and XVI: Medical Impairments That are Not Severe, SSR 85–28 (PPS–122), 1985 WL 56856, at *1-2 (S.S.A. 1985). SSR 85-28 set out the following guidance on non-severity of impairments at Step 2:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

*Id.* at *3. For ease of reference, this recommendation will refer to this standard as the "minimal effect" standard. *See Acosta v. Astrue*, 865 F. Supp. 2d 767, 775 (W.D. Tex. 2012) (using same description).

The next year, the Fifth Circuit recognized that "*Stone* does not require a wholesale remand of all severity cases" and remand is not proper "simply because the ALJ did not use 'magic words.'" *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Remand is proper "only where there is no indication the ALJ applied the correct standard" and the courts "must read the opinion of the ALJ carefully to ensure he or she used the 'slight impairment' standard in the nonseverity determination." *Id.* Under *Estran* and *Stone* and because there was "no indication in the opinion that the ALJ applied the correct standard," the court remanded "the case to the Secretary for reconsideration of the facts and any further evidence in light of the slight abnormality standard which we have stated over and over." *Id.*

In 1987, the Supreme Court issued a decision upholding the facial validity of the regulatory definition of severity. *See Bowen v. Yuckert*, 482 U.S. 137, 145-46 (1987). The concurring opinion recognized a "chorus of judicial criticism concerning the step two regulation" and that every appellate circuit had "either enjoined the Secretary's use of the step two regulation or imposed a narrowing construction upon it." *Id.* at 156 (O'Connor, J. concurring) (footnotes omitted). It further recognized that the "frustration expressed by these courts in dealing with the Secretary's application of step two in particular cases is substantial." *Id.* It found SSR 85-28 significant to curbing use of the regulation inconsistently with the statutory definition of disability. *Id.* at 157-58. The majority opinion likewise recognized SSR 85-28 as a subsequent agency response, but did "not undertake to construe this ruling." *Id.* at 154 n.12.

Although *Yuckert* provided an intervening Supreme Court opinion that might have altered the viability of *Stone*, the Fifth Circuit reaffirmed *Stone* in 1992. *See Anthony v. Sullivan*, 954 F.2d 289, 294-95 (5th Cir. 1992). In doing so, the Fifth Circuit found *Stone* "not inconsistent" with *Yuckert*, because "*Stone* merely reasons that the regulation cannot be applied to summarily dismiss, without consideration of the remaining steps in the sequential analysis, claims of those whose impairment is more than a slight abnormality." *Id.* at 294.

In 1996, the agency issued another SSR regarding the meaning of "severe." *See* Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe, SSR 96-3p, 1996 WL 374181 (S.S.A. July 2, 1996). With minor linguistic or semantic variations, SSR 96-3p uses the same minimal effect standard as SSR 85-28. *Acosta*, 865 F. Supp. 2d at 774 (discussing both SSRs).

The courts are divided as to whether an ALJ's citation to SSR 85-28, SSR 96-3p, or the mini-

mal effect standard comports with the slight abnormality standard of *Stone*. *See Acosta*, 865 F. Supp. 2d at 780 & nn. 13-14 (listing cases on both sides of the divide). Over the years, two primary views have emerged. The first is exemplified by *Sanders v. Astrue*, No. 3:07-CV-1827-G-BH, 2008 WL 4211146 (N.D. Tex. Sept. 12, 2008) (adopting recommendation of Mag. J.); *Scroggins v. Astrue*, 598 F. Supp. 2d 800 (N.D. Tex. 2009) (accepting recommendation of Mag. J. without objection), and similar cases. The second is exemplified by the more recent *Acosta* decision.

In *Sanders*, the court found the minimal effect standard incongruent with the slight abnormality standard set out in *Stone*. *See* 2008 WL 4211146, at *7. The court noted:

> Unlike the standard applied by the ALJ, *Stone* provides no allowance for a minimal interference on a claimant's ability to work. While the difference between the two statements appears slight, it is clear that the ALJ's construction is not an express statement of the *Stone* standard. This difference, coupled with the ALJ's failure to cite *Stone* or a similar opinion, leads the Court to conclude that the ALJ applied an incorrect standard of severity at step 2.

*Id.* The court went on to find that the error mandated reversal and remand. *See id.* at 8. *Sanders* directly led to *Scroggins* which utilizes the same language. These cases have led to numerous decisions with the same holdings. *See, e.g.*, *Charlton v. Astrue*, No. 310-CV-0056-O-BH, 2010 WL 3385002, at *6-7 (N.D. Tex. July 14, 2010) (recommendation of Mag. J.) *accepted by* 2010 WL 3385000 (N.D. Tex. Aug. 26, 2010); *Luna v. Astrue*, No. 3:09-CV-1436-M-BH, 2010 WL 582151, at *6-7 (N.D. Tex. Feb. 18, 2010) (accepting recommendation of Mag. J. without objection); *Webb v. Comm'r of Soc. Sec. Admin.*, No. 3:09-CV-0028-P-BH, 2009 WL 2043540, at *6-7 (N.D. Tex. July 13, 2009) (adopting recommendation of Mag. J.).

None of these cited decisions from the Northern District of Texas explored the historical basis for the minimal effect standard. While *Luna* and *Charlton* both mention SSRs 85-28 or 96-3p, *see Charlton*, 2010 WL 3385002, at *6 (noting that ALJ cited the SSRs in a parenthetical); *Luna*,

2010 WL 582151, at *6 (same), only *Luna* indicates that the agency argued that the SSRs affect the analysis, *see* 2010 WL 582151, at *6 & n.4.  However, because other cases including *Scroggins* had found the language used in SSR 85-28 inconsistent with *Stone*, *Luna* summarily rejected the argument.[13]  *See id.* at *6 n.4.  Both *Luna* and *Charlton* found the minimal effect standard inconsistent with *Stone* simply by citing to *Stone*.  *See id.* at *6; *Charlton*, 2010 WL 3385002, at *6.  Despite the lack of thorough analysis, courts began to follow the *Sanders* and *Scroggins* rationale for finding Step 2 error and finding that such error mandated remand.

Even at that time, however, some courts found no error in using the minimal effect standard. *See Acosta*, 865 F. Supp. 2d at 780 & n.13 (listing cases); *Winget v. Astrue*, No. MO-07-CV-017, 2007 WL 4975206, at *7 (W.D. Tex. Dec. 14, 2007) (recommendation of Mag. J.) (stating SSR 96-3p is "a restatement of the *Stone* standard").  Additional courts have likewise begun to follow *Acosta* and similar cases to find no error.[14]  *See, e.g.*, *Flowers v. Berryhill*, No. 7:16-CV-0135-O-BP, 2017 WL 2257596, at *4 (N.D. Tex. Apr. 18, 2017) (recommendation of Mag. J.) (finding *Acosta* persuasive and declining to follow *Scroggins*) *accepted by* 2017 WL 2225411 (N.D. Tex. May 22, 2017); *Juarez v. Colvin*, No. CV-H-15-1736, 2016 WL 7369128, at *17 (S.D. Tex. Nov. 30, 2016) (recommendation of Mag. J.) (recognizing that, in some cases, the Southern District of Texas has "declined to follow the *Scroggins* line of cases" and finding *Acosta* more persuasive), *adopted by* 2016 WL 7337974 (S.D. Tex. Dec. 19, 2016); *Sinayi v. Astrue*, No. 3:11-CV-2770-D, 2012 WL 3234414, at

[13]  Relying on *Barfield v. Barnhart*, 285 F. Supp. 2d 827 (S.D. Tex. 2002) the agency argued that SSR 85-28 qualifies as an authority of the same effect as *Stone*.  *Barfield* seems to accept that SSR 85-28 equates to the slight abnormality standard set out in *Stone*, but does so without analysis.  *See* 285 F. Supp. 2d at 834.

[14]Notably, the Fifth Circuit has equated the *Stone* standard with the minimal effect standard, albeit in a nonbinding per curiam decision that merely stated the minimal effect standard with a citation to *Stone*.  *See Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010) (per curiam) ("An impairment is severe if it significantly limits an individual's physical or mental abilities to do basic work activities; it is not severe if it is a slight abnormality or combination of slight abnormalities that has no more than a minimal effect on the claimant's ability to do basic work activities.").

*3 (N.D. Tex. Aug. 9, 2012) (citing *Acosta* with approval and declining to follow *Scroggins*). Some courts which find that an ALJ errs by using the minimal effect standard disagree with *Scroggins* that the error mandates remand without analyzing the error to determine whether it is harmless. *See*, *e.g.*, *[Ramona] Jones v. Astrue*, 821 F. Supp. 2d 842, 850 (N.D. Tex. 2011).

Although *Sanders* recognized that the difference between the slight abnormality and minimal effect standards "appears slight," it nevertheless proclaimed that "*Stone* provides no allowance for a minimal interference on a claimant's ability to work." *See* 2008 WL 4211146, at *7. The proclamation, however, appears to ignore important language. *Stone* specifically stated that the slight abnormality "would not be expected to interfere" with the individual's ability to work. It did not state definitively that the abnormality "would not interfere" with the ability to work as interpreted in *Sanders*. If *Stone* had indeed wanted to provide for no interference on a claimant's ability to work, it would have had no reason to include the would-not-be-expected language. Given the uncertainty expressed within the *Stone* standard, it appears that *Stone* does provide some limited allowance for minimal interference even though such interference would not be expected.

The undersigned knows of no decision predating *Sanders* in which the court criticized or found the minimal effect standard inconsistent with *Stone*. That would be unsurprising had the standard simply arose during that time period. However, the criticized language is also found within SSR 85-28 – and in various forms within SSR 96-3p. It is thus surprising that the first criticism of the minimal effect standard appears to have arisen twenty-three years after SSR 85-28. *Sanders*, *Scroggins*, and similar cases "rely on a strict and narrow reading" of the non-severity standard set out in *Stone*. *See Acosta*, 865 F. Supp. 2d at 781; *accord Flowers*, 2017 WL 2257596, at *4; *Coutee v. Colvin*, No. CIV.A. H-11-4519, 2013 WL 2189867, at *3 (S.D. Tex. May 15, 2013). The Court

should join the growing list of courts to find that the minimal effect standard satisfies *Stone*, equates to the slight abnormality standard, and an ALJ does not err when he or she applies that standard. By doing so, the Court should decline to follow the line of cases exemplified by *Scroggins*, *Sanders*, *Luna*, etc. Because the ALJ did not err in using the minimal effect standard, there is no need to address whether a harmless error analysis applies.

## B. Severe Impairments

Claimant argues that she has been prejudiced by the ALJ's use of the wrong severity standard. Pl.'s Appeal at 4. Of course, there is no need to consider prejudice given the recommendation that the Court find that the ALJ applied a severity standard that is consistent with *Stone*. Nevertheless, Claimant makes contentions and assertions that warrant brief discussion. Claimant contends that the ALJ did not properly consider all of her severe impairments because he applied the wrong standard. *Id.* at 4-5. More specifically, she asserts that the ALJ did not consider her depressive disorder or her dysthymic disorder with a history of recurring major depression. *Id.* at 5. She further asserts that the ALJ failed to evaluate whether she had an affective disorder that satisfied Listing 12.04 and failed to consider functional limitations from her personality disorder when he determined her RFC. *Id.* at 5-6.

While his decision could be more clear in some respects, it is clear that the ALJ found that Claimant has a severe affective disorder even though he failed to list it in his initial list of severe impairments. *See* R. 13 (stating that medical evidence establishes that claimant has a severe affective disorder), 16 (discussing whether claimant's affective disorder satisfies Listings 12.04 (affective disorders) or 12.06 (anxiety disorders)). Further, although the ALJ did not specifically identify the

severe affective disorder as a depressive or dysthymic disorder,[15] such specificity is not necessary

to properly consider the impairment. The administrative record simply does not support the assertion

that the ALJ failed to consider whether Claimant had an affective disorder that satisfied Listing

12.04. *See* R. 16 (showing such consideration). As for the alleged failure to consider limitations

from her personality disorder, such error is better addressed later in this recommendation, if neces-

sary, because the alleged error relates to the ALJ's RFC determination, not his determination of

severity.

The Court should find that these alleged errors related to the severity standard provide no

basis to remand this action.

## C. RFC Determination and Weight Given to Medical Evidence

Claimant contends that the ALJ failed to give proper consideration to opinions of her treating

physician, Charles Anthony Carlton, M.D., when determining her RFC. Pl.'s Appeal at 12-13. She

further contends that the ALJ failed to properly consider opinions of Richard Handelsman, D.O., a

physician who reviewed her medical record with respect to an insurance claim. *Id.* at 14. As men-

tioned in the preceding subsection, Claimant also asserts that the ALJ failed to consider functional

limitations from her personality disorder (as diagnosed by James P. David Jr., Psy.D.) when he

determined her RFC. *Id.* at 6.

When considering whether a claimant is disabled, the Commissioner considers the medical

evidence available, including medical opinions.[16] *See* 20 C.F.R. § 404.1527(b) (effective Aug. 24,

---

[15]For ease of reference, this recommendation will refer to these disorders generically as depression.

[16]As explained to claimants: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). These regulations, however,

2012, to Mar. 26, 2017). Medical opinions may come from treating sources (for example primary care physicians), non-treating sources (physicians who perform a single examination of the claimant), or non-examining sources (a physician who reviews only the claimant's medical record). *See generally* 20 C.F.R. § 404.1502 (effective June 13, 2011, to Mar. 26, 2017). The Fifth Circuit has "long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Nevertheless, even opinions from a treating source are "far from conclusive," because ALJs have "the sole responsibility for determining the claimant's disability status." *Id.*; *accord Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

"After identifying relevant medical opinions of treating physicians, ALJs must determine whether any such opinion is entitled to controlling weight." *Bentley v. Colvin*, No. 3:13-CV-4238-P, 2015 WL 5836029, at *7 (N.D. Tex. Sept. 30, 2015) (citing 20 C.F.R. § 404.1527(c)(2) and its Title XVI counterpart, § 416.927(c)(2)). When identifying and considering relevant opinions, ALJs "must remember" that some medical records, such as medical source statements provided by a treating source, "may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5P, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).

---

reserve some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulation. *Id.* § 404.1527(d). Effective March 27, 2017, § 404.1527 sets out a two-tiered approach for applying the regulation: "For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply." Regardless, the pertinent version for this appeal remains the one in effect when the ALJ issued his decision. *See Young v. Berryhill*, No. 16-20786, 2017 WL 2312859, at *2 n.3 (5th Cir. May 26, 2017) (per curiam).

The regulations provide a six-factor detailed analysis to follow unless the ALJ gives "a treating source's opinion controlling weight." 20 C.F.R. § 404.1527(c)(1)-(6) (effective Aug. 24, 2012, to Mar. 26, 2017).[17] "When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with' other substantial evidence." *Wilder v. Colvin*, No. 3:13-CV-3014-P, 2014 WL 2931884, at *3 (N.D. Tex. June 30, 2014) (quoting *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)); *accord* 20 C.F.R. § 404.1527(c)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). Furthermore, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the regulations]." *Newton*, 209 F.3d at 453.

In addition, under 20 C.F.R. § 404.1520b(c)(1), "the ALJ may re-contact a treating physician or other medical source if there is insufficient evidence to determine whether the claimant is disabled." *Perry v. Colvin*, No. 3:13-CV-2252-P, 2015 WL 5458925, at *7 (N.D. Tex. Sept. 17, 2015); *accord Jones v. Colvin*, No. 4:13-CV-818-A, 2015 WL 631670, at *7 (N.D. Tex. Feb. 13, 2015) (accepting recommendation of Mag. J. which recognized that, effective March 26, 2012, this new regulation replaced the former mandatory requirement of § 404.1512(e) applied in *Newton*). Further,

---

[17]These factors are: (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of the treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c) (effective Aug. 24, 2012, to Mar. 26, 2017). Even with the recent regulatory amendments, these factors remain relevant for claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527(c) (effective Mar. 27, 2017). For claims filed on or after March 27, 2017, 20 C.F.R. § 404.1520c provides details on how the administration considers and articulates medical opinions and prior administrative medical findings.

"if after weighing the evidence [the ALJ] cannot reach a conclusion about whether [the claimant is] disabled," § 404.1520b(c) provides "various options, including re-contacting a treating physician or other medical source, to resolve an inconsistency or insufficiency of evidence." *Bentley*, 2015 WL 5836029, at *8 (citing 20 C.F.R. §§ 404.1520b(c), 416.920b(c) (effective Mar. 26, 2012 to March 26, 2017)).

ALJs who find a treating source opinion not entitled to controlling weight must consider the six factors of § 404.1527(c) to properly assess the weight to give such opinions. *Newton*, 209 F.3d at 456. However, "*Newton* requires only that the ALJ 'consider' each of the [§ 404.1527(c)] factors and articulate good reasons for its decision to accept or reject the treating physician's opinion. The [ALJ] need not *recite* each factor as a litany in every case." *Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010) (emphasis added); *accord Emery v. Astrue*, No. 7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept. 17, 2008); *Burk v. Astrue*, No. 3:07-CV-899-B, 2008 WL 4899232, at *4 (N.D. Tex. Nov. 12, 2008) (accepting recommendation of Mag. J.). *Newton*, furthermore, does not require the detailed analysis when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." 209 F.3d at 458. Likewise, the detailed analysis under *Newton* is not necessary when the ALJ has weighed the treating physician's opinion against opinions of other treating or examining physicians who "have specific medical bases for a contrary opinion." *Id.*

The ALJ, as fact-finder, "has the sole responsibility for weighing evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). ALJs have considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton*,

209 F.3d at 455-56. Additionally, for good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

Prior to the alleged onset of disability on October 31, 2012, medical records of Dr. Carlton show a history of migraines and other headaches commencing prior to October 13, 2011. *See* R. 326 (office visit for migraine on October 13, 2011, with complaints "of a several week history of headaches"); 329 (November 21, 2011 visit for headaches with note that "headaches have decreased in frequency and severity" on medication); 331 (December 6, 2011 visit for migraine and headaches); 334 (January 13, 2012 visit for headache); 342 (August 27, 2012 visit for migraine). Each of those medical records list depression among other chronic problems and Claimant also visited Dr. Carlton for (1) depression on July 13, 2012, R. 338; (2) nausea and vomiting secondary to IBS on October 2, 2012, R. 346; diarrhea on October 9, 2012, R. 350; knee contusions from a fall on October 18, 2012, R. 355; and left knee pain on October 26, 2012, R. 359-61 (reporting two migraines and was positive for headache). Commencing October 2012, the medical records identify chronic headache along with depression and others as chronic problems. *See* R. 346, 350, 355, 359. Consistent with a December 16, 2011 CT examination, an October 24, 2012 MRI of Claimant's head shows that her "brain is essentially normal in appearance." R. 384.

Records from Dr. Carlton continue to note migraines and other headaches in November and December 2012. *See* R. 364, 367-69, 371, 375. On December 27, 2012, Dr. Carlton completed an Ortho/Neuro Questionnaire for insurance purposes. *See* R. 388-90. At that time, his primary diag-

nosis was migraine headaches with a secondary diagnosis of IBS. R. 388. He recorded symptoms of cervical pain and severe head, neck, and shoulder pain. *Id.* Physical findings included distinct muscle spasm in the neck with respect to Claimant's headaches and in the abdomen for the IBS. *Id.* Furthermore, Dr. Carlton noted that "MRI or CT scans confirm disease" and that endoscopy and colonoscopy also correlate with the clinical findings. R. 389.

Based on objective findings, Dr. Carlton opined that Claimant could only tolerate up to two hours each for sitting, standing, and walking during a workday. *Id.* He further opined that she could occasionally lift, carry, and push/pull up to ten pounds and had no restriction on using her hands for repetitive action such as simple grasping, pushing/pulling, fine manipulation, and finger dexterity. *Id.* He also opined that she could frequently balance and reach at and above shoulder level, but could only occasionally reach below shoulder level, bend, stoop, twist, squat, kneel, crouch, crawl, or climb ladders or stairs. R. 390. In addition, he stated that a significant emotional or behavioral disorder complicates his assessment and treatment of Claimant. *Id.* He expected her condition to remain the same and stated that it was "unknown" as to when she could return to work, but "possible after surgery" for her uterine prolapse. *Id.*

Dr. Carlton treated Claimant for migraines on January 9, 2013. *See* R. 379. In a Short Term Disability Attending Physician's Statement dated that same date, he identified migraine headaches as the primary diagnosis, IBS as his secondary diagnosis, and again stated "unknown" when patient could return to work while also underlining "Unable to determine." R. 386. Later that month, Dr. Handelsman reviewed Claimant's medical file and concluded that her "recurrent migraine headaches" would preclude "sustainable work capacity at any level" because of their frequency and duration. R. 392. He also indicated that Claimant had been referred for neurological examination, but

he did not have any record of such examination and would like to obtain that information, if she had been evaluated.[18] *Id.* Otherwise, he wanted to follow-up with Claimant in three months. *Id.*

Dr. David conducted a psychological evaluation with mental status exam on March 1, 2013. *See* R. 393-99. He observed that Claimant gave good effort, quickly became tearful, and had "rather labile" emotions. R. 393. Claimant complained of depression and reported that her crying increased after being fired when her short-term disability "ran out." R. 393, 396. At the time of the evaluation, a lack of money caused her to be taking only over-the-counter medication. R. 393. She reported taking antidepressants since about 2008, but had not been hospitalized for psychiatric reasons. R. 394. As for activities of daily living, she reported being "independent and able to cook, clean, bathe . . . go shopping, run errands, clean the house and clean herself." *Id.* However, she also reported that, when she becomes quite depressed," she "will let all of these things slide." *Id.* Claimant was "able to follow a three-step instruction and complete simple tasks during the interview," but described "some difficulty maintaining focus on mor complex tasks in daily life." R. 395. She reported having "migraine headaches since 1994." R. 396. Although Claimant reported "difficulty with concentration and memory," they "appear[ed] grossly intact on mental status exam." R. 399. Dr. David noted that prior "medical notes suggest relative stability when she is followed on medication but she cannot afford this now." *Id.*

Among other things, Dr. David diagnosed (1) dysthymic disorder with history of recurring major depression that was "currently between episodes"; (2) post traumatic stress disorder ("PTSD"); and (3) unspecified personality disorder with obsessive-compulsive and borderline personality traits. *Id.* He identified various symptoms leading to his diagnoses: (1) Claimant described a "general

---

[18]Claimant testified that she did not see the neurologist because she lost her insurance. R. 46.

25

mood lability consistent with Borderline Personality Disorder"; (2) she had "a history of impulsive-ness, anger outbursts, and erratic relationship history consistent with borderline personality"; (3) she described "an overlay of major depressive episodes that come and go," which "can last months at a time"; (4) she "is very organized and becomes angry when things are not done a certain way"; and (5) when she encounters conflict, "she becomes distressed and agitated." R. 398. He assessed her prognosis as "guarded to fair" and found her "capable of managing [her] own affairs/monies." R. 399.

Dr. Carlton continued to treat Claimant for headaches, IBS, and back pain in 2013. *See* R. 400 (IBS July 31, 2013, with notation of chronic headaches), 428 (headache and back pain November 7, 2013, with notation that headache had improved some with restart of medications).

On September 16, 2013, a state agency consultant, Jim Cox, Ph.D., reviewed the medical record and found medically determinable severe impairments (gastritis/duodenitis and affective disorders) that were not disabling. R. 77-78. He further found that the mental impairments caused no repeated episodes of decompensation of extended duration and only mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. R. 78.

That same day, another consultant, John Durfor, M.D., assessed Claimant's physical RFC. R. 79-80. He noted the following exertional limitations: (1) lifting and/or carrying twenty pounds occasionally, ten pound frequently; (2) standing/walking limited to about six hours; (3) sitting limited to about six hours; and (4) pushing/pulling limited the same as lifting and/or carrying. *Id.* He found no postural, manipulative, visual, communicative, or environmental limitations. R. 80.

On November 20, 2013, state agency consultants Connie Benfield, Ph.D., and Brian Harper,

M.D., reviewed the medical record on reconsideration. R. 84-94. The noted medically determinable impairments remained unchanged, as did the evaluation of Claimant's mental impairments and physical RFC. *See* R. 89-91.

On February 3, 2014, Dr. Carlton created a summary of onset dates for Claimant's ailments: March 8, 2010, for dysthymia, depressive disorder, edema, and uterine prolapse and September 12, 2012, for headache. R. 422. That same day, Claimant visited Dr. Carlton for follow-up on a headache and the doctor noted "a decrease in frequency and severity of the headaches" due to medication and Claimant was not having daily headaches, but about once every six weeks. *Id.* A review of her systems showed she was positive for headache. R. 424.

Dr. Carlton completed a questionnaire regarding Claimant's headaches in May 2014. *See* R. 416-17. He noted that Claimant had been his patient for 26 years; she experienced migraine headaches "at least once a month," which last one to three days and precluded "attention and concentration required for even simple, unskilled work tasks"; and she experienced moderate headaches weekly that "would eliminate skilled work tasks." R. 416. He treated the headaches with medication that would cause drowsiness and she "needs complete bed rest when taking migraine medicines." R. 416-17. He opined that Claimant was unable to maintain competitive employment on a sustained basis due to her headaches and would miss work ten to fifteen days or more a month. R. 417. He also commented that Claimant was "unable to work on computer or stand for more than 2 hours at a time" because it would trigger a headache. *Id.*

That same day, Dr. Carlton stated that Claimant experiences moderate to severe pain, R. 433, and completed a Physical Capacities Evaluation regarding Claimant's pain and fatigue, R. 418-19. He opined that Claimant could sit for two hours; stand/walk for two hours; occasionally lift/carry

ten pounds or less; occasionally balance and reach above shoulder level. *Id.* He opined that she could not use her hands for pushing, pulling, or repetitive motion tasks and could not use either foot for repetitive movements. R. 418. He also found that she suffers from (1) fatigue secondary to her migraine medications and depression and (2) pain secondary to her migraines, chronic back pain, irritable bowel syndrome, and uterine prolapse, and edema – both of which would prevent work even in a sedentary position. R. 420-21.

The ALJ recognized Dr. Carlton's status as a treating physician, but found his opinions not entitled to controlling weight "because they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with the other substantial evidence of record," including statements of her activities of daily living. R. 22. The ALJ accorded "very little weight" to the opinion that Claimant's medications "prevent her from engaging in the attention and concentration required for even simple, unskilled work tasks . . . because the record shows that the claimant admitted that she engaged in daily unskilled tasks" as shown by admissions to Dr. David that "she could cook, clean, manage money, and shop. activities inconsistent with an inability to stand or sit for more than two hours." *Id.* The ALJ also noted that the mental status examination of Dr. David "failed to reveal any significant attention or memory problems." *Id.* In addition, the ALJ discounted the opinions of Dr. Carlton because the fact that, "claimant has suffered migraine headaches since 1994, with no increase in frequency or severity . . . directly contradicts Dr. Carlton's proposition that the claimant's migraine headaches are the primary catalyst preventing her from working." *Id.* Furthermore, the ALJ found Dr. Carlton's opinion "quite conclusory" overall and "provid[es] very little explanation of the evidence he relied on in forming his opinion." *Id.* Finally, the ALJ noted that "Dr. Carlton did not document positive objective clinical or diagnostic findings

to support the functional assessment, and provided no indication of how or why he reached the functional limitations he assigned the claimant." *Id.*

Recognizing that Dr. Handelsman does not qualify as a treating or examining source, the ALJ assigned "only partial weight" to his opinion. *Id.* More particularly, the ALJ gave "great weight" to the opinion that Claimant's "IBS does not affect her ability to sustain gainful employment," but gave "little weight" to the opinion that her migraines were debilitating and precluded working at any level. *Id.* at 22-23. The ALJ found the latter opinion to be based on a frequency and duration of migraine headaches that is contrary to the medical record, which shows "five clinical visits over two years by the claimant relating to subject reports of migraine headaches – far fewer than would be expected if they were causing her such debilitating and severe pain." R. 22. The ALJ criticized Dr. Handelsman for relying "quite heavily" on the Claimant's subjective symptoms and limitations. *Id.*

As a treating physician, Dr. Carlton's medical opinions were entitled to controlling weight if well-supported as required by the regulations and not inconsistent with other substantial evidence. The ALJ specifically found the opinions not entitled to controlling weight and that finding is not at issue in this case. Once the ALJ makes that finding, he must make the detailed analysis required by 20 C.F.R. § 404.1527(c) unless there is reliable medical evidence from a treating or examining physician controverting the claimant's treating physician. Although the ALJ partially relies on opinions of an examining source, Dr. David, regarding alleged limitations in memory and attention secondary to Claimant's mental impairments, the ALJ does not rely on any treating or examining source to otherwise controvert Dr. Carlton's medical opinions.

In this case, the ALJ did not recite the six factors, although he does note in conclusory fashion that he had "considered opinion evidence in accordance with the requirements of 20 CFR

404.1527" and various social security rulings. *See* R. 17. An ALJ cannot substitute a general, conclusory statement for consideration of the six factors. Furthermore, while the ALJ decision reflects consideration of some factors, overall, the decision does not reflect consideration of all of the factors. It thus appears that the ALJ procedurally erred by not more fully considering and weighing the opinions of Dr. Carlton.

A procedural error does not require reversal and remand, however, unless the error affects the substantial rights of the claimant. *Snodgrass v. Colvin*, No. 3:11-CV-0219-P, 2013 WL 4223640, at *7 (N.D. Tex. Aug. 13, 2013) (citing *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012)). To warrant reversal, the error must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error." *Ware v. Colvin*, No. 3:11-CV-1133-P, 2013 WL 3829472, at *4 (N.D. Tex. July 24, 2013) (citing *January v. Astrue*, 400 F. App'x 929, 933 (5th Cir. 2010) (per curiam)).

On the record before the Court, the failure to conduct the detailed analysis is not harmless error. Dr. Carlton provided the only reliable medical opinions of Claimant's physical abilities from a treating or examining source.[19] Rather than properly weigh and consider those opinions in accordance with the regulation and *Newton*, the ALJ accorded greater weight to medical opinions of two non-examining consultants (Dr. Durfor and Dr. Harper). *See* R. 23. The ALJ accepted their opinions that Claimant could lift ten pounds frequently and twenty pounds occasionally, whereas Dr.

---

[19]Although the ALJ relies on medical opinions of Dr. David with respect to whether Claimant suffers from any significant memory or attention limitations from her mental impairments, R. 22, Dr. David makes no opinion regarding Claimant's physical capabilities, *see* R. 393-99. Similarly, although the ALJ discusses medical evidence from two physicians (Joseph H. Shelton, M.D., and Michael John England, M.D.) who treated Claimant's IBS and uterine prolapse, R. 19-20, neither treating source made any opinion about Claimant's physical capabilities, *see* R. 275-314.

Carlton had opined that maximum lifting was limited to ten pounds or less. The opinions differed even more significantly with respect to Claimant's ability to sit and stand. Dr. Carlton opined that Claimant was limited to sitting for two hours and standing/walking for two hours, but consultants opined that she could perform those tasks for about six hours for sitting and standing/walking. Based on Dr. Carlton's medical opinions regarding Claimant's ability to lift/carry, sit, stand, and walk, Claimant did not possess the functional ability for light work. *See* Titles II & XVI: Determining Capability to do Other Work – The Medical-Vocational Rules of Appendix 2, SSR 83-10 (PPS–101), 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).

In making his RFC assessment, the ALJ rejected specific medical opinions of Dr. Carlton. Rejecting medical opinions when there is no contrary opinion from a treating or examining source requires usurping the physicians' role. *See Newton v. Apfel*, 209 F.3d 448, 453-58 (5th Cir. 2000). "That is neither the role of the ALJ nor this Court. Neither the courts nor ALJs may rely on their own medical opinions as to the limitations presented by a claimant's impairments." *Howeth v. Colvin*, No. 3:12-CV-0979-P, 2014 WL 696471, at *11 (N.D. Tex. Feb. 24, 2014) (citing *Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam) (reversing denial of benefits when the ALJ impermissibly relied on his own medical opinions as to limitations presented by the claimant's impairments)). It is reversible error for ALJs to substitute their own medical opinions for those of a treating physician. *Evans v. Colvin*, No. 1:14-CV-202-BL, 2015 WL 9685552, at *3 (N.D. Tex. Dec. 8, 2015) (recommendation of Mag. J.), *adopted by* 2016 WL 112645 (N.D. Tex. Jan. 8, 2016).

Like *Newton*, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *See* 209 F.3d at 458. While the ALJ relied on medical opinions of two agency consultants, such opinions

do not constitute first-hand medical evidence, because they were formed on a second-hand basis from a review of then existing medical records. Like *Newton*, this is not "a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *See id.* Instead, like *Newton*, the ALJ in this case rejected medical opinions of a treating physician based only on opinions of non-examining physicians. *See id.* With respect to the opinions about Claimant's exertional ability to engage in work-type activities, the ALJ did not reject the medical opinions of Dr. Carlton due to any inconsistency with any medical opinion from a treating or examining source. By relying on the opinions of the consultants to find certain limitations of Dr. Carlton unsupported, the ALJ erred. Furthermore, to the extent the ALJ perceived a need for an additional or updated medical opinion, he took no steps to secure such opinion from any medical expert. The medical record before the ALJ provides no basis for rejecting the exertional limitations noted by Claimant's treating physician.

The Commissioner in this case carried her Step 5 burden through testimony of a VE who identified light jobs based upon the RFC assessed by the ALJ. Had the ALJ properly considered the medical opinions of Dr. Carlton, there is a realistic possibility that his RFC assessment would have changed. The opinions of Dr. Carlton support limitations greater than the RFC assessment. A change in the limitations within the questioning to the VE would cast doubt upon the existence of substantial evidence to support the ALJ's decision because to constitute substantial evidence to support a Step 5 finding of non-disability, testimony from a VE must include all limitations warranted by the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002); *Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001). Accordingly, to rely on the VE testimony to satisfy the

Step 5 burden, the ALJ's hypothetical questioning would need to include all limitations warranted by the evidence.

The Court should find that the ALJ improperly considered and weighed opinions of Dr. Carlton regarding Claimant's exertional limitations. There is no good cause to discount the weight of those opinions relative to any other expert. The ALJ failed to perform the detailed analysis required by 20 C.F.R. § 404.1527. Had he conducted that analysis and properly considered and weighed the opinions of the treating physician there a realistic possibility that he would have altered the hypothetical to the VE to include greater exertional limitations than assessed in the current RFC. Consequently, the procedural error casts doubt on the existence of substantial evidence to support the decision to deny benefits. Therefore, Claimant's substantial rights have been affected by the consideration and weight accorded to the opinions of the treating physicians by the ALJ. This procedural error is not harmless and warrants remand.

Although this error warrants remand of itself, other matters deserve brief discussion so as to guide the ALJ on remand. First, the ALJ provides unpersuasive reasoning for according "very little weight" to Dr. Carlton's opinion that medications limit Claimant's abilities to concentrate and maintain attention. The ALJ found the opinion inconsistent with Claimant's activities reported to Dr. David, but neglects to recognize that she also reported that she does not do those activities when she becomes quite depressed. The ALJ further noted that Dr. David's mental status examination "failed to reveal any significant attention or memory problems," but the evaluation clearly reflects that Claimant was taking only over-the-counter medication at that time. That over-the-counter medications may not limit attention or memory has no apparent relationship to whether prescribed medications limit concentration and attention. The Commissioner consistently argues that pain alleviated

by medication is not disabling. However, side-effects from medication may render an individual unable to work. On remand, the ALJ should consider how side-effects from headache or other medications affect Claimant's functional ability to perform work activities.

Furthermore, Dr. David's opinions are specifically limited to when Claimant is between episodes of recurring major depression. His opinions may thus hold less weight in other contexts. The ALJ also found daily activities inconsistent with an inability to stand or sit for more than two hours, but provides no basis for the finding. While Claimant may cook, clean, manage money, and shop, nothing of record indicates that Claimant engages in such activities beyond the limitations recorded by Dr. Carlton.

In addition, the ALJ discounted opinions of Dr. Carlton because the ALJ viewed the record as not showing any increase or frequency of headaches. However, without obtaining earlier medical records for Claimant, it appears unreasonable and speculative to find that the frequency and duration of her headaches has remained the same since 1994. Claimant testified that they had gotten more frequent and worse. R. 37. Even without that testimony, the record provides more of a basis to infer an increase in frequency and duration than to make the opposite inference. The medical record of Dr. Carlton does not list headaches as a chronic problem until October 2012. Furthermore, his summary of onset dates states that Claimant's headaches started September 27, 2012.

While Claimant alleges that the ALJ failed to properly consider opinions of Dr. Handelsman and failed to consider functional limitations from her personality disorder as diagnosed by Dr. David, there is no need to address such alleged errors given the prejudicial error resulting from the consideration of the opinions of Dr. Carlton. On remand, Claimant may request further consideration of the opinions of Dr. Handelsman and the functional limitations resulting from her personality

disorder. Based on the improper consideration of medical opinions of Claimant's treating physician, the ALJ will necessarily need to re-access her physical RFC, formulate appropriate hypothetical questions for a VE based on the new assessment, and re-question a VE. When doing so, the ALJ should consider the impact that Claimant's severe mental impairments have on her RFC and functional abilities to perform work in the national economy.

## IV. CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court should find that the administrative law judge applied a severity standard that is consistent with *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and committed no error at Step 2 of the sequential evaluative sequence. In doing so, the Court should decline to follow the line of cases that rely on a strict and narrow reading of the non-severity standard set out in *Stone*. Although the Court should find no Step 2 error, it should find that the administrative law judge committed reversible error by not properly considering opinions of Claimant's treating physician. The undersigned thus **RECOMMENDS** that the district court **REVERSE** the Commissioner's decision to deny benefits and **REMAND** this case for further administrative proceedings consistent with this recommendation.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge

is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED this 3rd day of August, 2017.**

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**